**DAVID J. HOLDSWORTH (4052)**

9125 South Monroe Plaza Way, Suite C

Sandy, UT  84070

Telephone (801) 352-7701

Facsimile (801) 567-9960

david_holdsworth@hotmail.com

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| MICHAEL GUNN, | : | **COMPLAINT** |
| | : | **(JURY TRIAL DEMANDED)** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SALT LAKE CITY CORPORATION, | : | Civil No. 2:25-cv-836 |
| | : | |
| Defendant. | : | Hon. |

COMES NOW the Plaintiff, Michael Gunn, complains of Defendant Salt Lake City Corporation, demands trial by jury, and as and for causes of action, alleges as follows:

## I.  JURISDICTION AND VENUE

1.      This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, for discrimination in employment and for retaliation. Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000 e (5). Equitable and other relief are also sought under 42 U.S.C. § 2000 e (5) (g).

Jurisdiction is also based on 28 U.S.C. §§ 1331, 1332 and 42 U.S.C. § 1981, et. seq. Where employment discrimination based upon age is alleged, jurisdiction is conferred by the Age Discrimination in Employment Act ("ADEA"). Where employment based on disability is alleged, jurisdiction is conferred by the Americans with Disabilities Act ("ADA") and/or the Vocational Rehabilitation Act ("VRA") (collectively referred to as "the ADA").

2.    This Court has jurisdiction over this matter pursuant to federal question — namely, the interpretation and application of Title VII, the ADEA, and the ADA, and 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983.

3.    At all times relevant to this action, the individual(s) whose actions affecting Plaintiff are complained of herein are and/or were employees or agents of Defendant Salt Lake City Corporation, and for all purposes herein, acted within the course and scope of their employment with and for Salt Lake City Corporation, such that their actions and inactions are attributable to Salt Lake City Corporation.

4.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that the claims arose in the State of Utah, Salt Lake City Corporation, employed Plaintiff in the State of Utah; all of the employment practices alleged herein occurred within the State of Utah; and the relevant employment records are maintained in the State of Utah.

2

## II.  PARTIES

5.      Mr. Gunn is an individual who is a citizen of the United States and, who at all times relevant hereto, was a resident of the State of Utah.

6.      The entity named as Defendant herein is Salt Lake City Corporation (hereinafter "Defendant" or "Salt Lake City").  On information and belief, Plaintiff alleges that, at all times relevant hereto, Salt Lake City Corporation (hereinafter "Defendant"), was a governmental entity which was doing business in Utah and which employed 15 or more employees in Utah, including Plaintiff.  Plaintiff alleges that Defendant is an "employer" within the meaning of Title VII, the ADEA and the ADA.  Plaintiff alleges Defendant was his employer at all times relevant to this action.

## III.  EXHAUSTION OF ADMINISTRATIVE PROCESSES AND REMEDIES

7.      On October 9, 2024, Plaintiff filed a Charge of Discrimination with the UALD in which he alleged that Defendant had discriminated against him based on his age, disability and had retaliated against him based on his engagement in protected activity.  On October 30, 2024, Plaintiff filed an Amended Charge of Discrimination.

8.      When Mr. Gunn filed his Charge of Discrimination with the UALD, such Charge was dual-filed with the EEOC.  Under the Utah

3

Antidiscrimination Act of 1965, the "look-back" period is 180 days.  Under the federal

statutes mentioned above, the look-back period is 300 days.  Counting back 300 days

from October 9, 2024, is December 14, 2023.  Because Plaintiff had a dual-filed

Charge with the EEOC, Plaintiff alleges he can take advantage of the 300-day look-

back period, as such look-back period applies to both discrete and non-discrete actions,

decisions and events.

       9.     Plaintiff filed his Charge of Discrimination within 300 days from

the last date of the alleged harm.

       10.    Plaintiff alleges the Court may exercise jurisdiction over: (1) all

non-discrete discriminatory actions constituting a continuing violation beginning

before December 14, 2023, the date which is 300 days before Plaintiff filed his Charge

of Discrimination, and continuing past December 14, 2023; and (2) over all discrete

discriminatory actions occurring on or after December 14, 2023.  The Court may treat

all alleged discrete discriminatory actions occurring before this date as being untimely

for purposes of relief, but may give weight to evidence of such for evidentiary

purposes.  Plaintiff alleges all jurisdictional requirements have been met as required by

Title VII, the ADEA and the ADA.

       11.    Plaintiff acknowledges that, although any discrete adverse action

occurring prior to December 14, 2023, might be considered generally outside the

jurisdiction of the Court, in the case of a claim of non-discrete actions, such as the allowance of conditions creating a hostile work environment claim, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and, if so, whether any act falls within the statutory time period". *Amtrak v. Morgan,* 536 U.S. 101 (2002). Plaintiff alleges many of the actions alleged herein were not discrete actions, but some of which non-discrete actions which created a hostile work environment and which fell within the statutory look-back period.

12.     Thus, to the extent Plaintiff alleges non-discrete actions, decisions and events which constitute a continuing violation which continued past December 14, 2023, his allegations as to such actions, decisions and events are not time barred.

13.     Plaintiff alleges he has exhausted all applicable administrative processes and remedies.

## IV.  STATEMENT OF FACTS

### *Background*

14.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 13 above as if alleged in full herein.

15.     Plaintiff alleges that, in June 2013, Defendant hired him to work as a watershed ranger.

16.    Plaintiff alleges that he is male.

17.    Plaintiff alleges that, at all times relevant hereto, he was over 40 years of age.

18.    Plaintiff alleges that he is a person with a disability in that he has an impairment of a learning disability, which substantially limits several of his major life activities, including learning, communicating interacting with others and working. During his employment, he developed problems with his feet, which substantially limited his ability to be mobile.

19.    Petitioner alleges he was a qualified individual with a disability in that he was able to perform the essential functions of his job with reasonable accommodations.

20.    Plaintiff alleges he engaged in protected activity.

21.    Plaintiff alleges that he has reason to believe that, because of these, Defendant subjected him to harassment, discrimination and retaliation.

22.    Plaintiff alleges that, at various times during his employment, including in June 2019 and again in November 2022, he requested reasonable accommodation from Defendant for his disability.

23.    Plaintiff alleges that Defendant did not grant him the accommodations he requested on a consistent basis.

6

24.     Plaintiff alleges that, at one point, Defendant did let him take short-term disability, but during such period of time, still required him to do things that he was not able to do, due to his disability not being accommodated.

25.     Plaintiff alleges he continued to ask for accommodations.

26.     Plaintiff alleges that, thereafter, on July 11, 2023, Defendant notified him that there were no further accommodations that Defendant was willing to make and no other position to which Defendant was willing to transfer him, and it was going to terminate his employment on July 23, 2023.

27.     Plaintiff alleges that, after several conversations regarding the ending of his employment (which conversations continued for a few months), on April 17, 2024, Defendant constructively discharged him because of the above factors.

28.     Thus, Plaintiff alleges that Defendant harassed and discriminated against him based on his age and disability, and retaliated against him for engaging in protected activity in the form of requesting accommodations and a transfer to a different position.

29.     Plaintiff alleges that the acts of his employer are in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and the Americans with Disabilities Act of 1990.

### *Facts Relevant to the Claims Being Asserted*

30.    Plaintiff explains the particulars of his allegations in his own words as follows:

a.    Plaintiff began employment with Defendant (sometimes referred to herein as "the City").

b.    June 24th, 2013 – In a ride-along training with Patrick Nelson while driving on the on-ramp to I-80 out of Lambs Canyon, Patrick was fumbling to answer his cell phone and connect to the Toyota he was driving. It is against city policy to be distracted by a cell device.

c.    Later the same day, in City Creek Canyon, Patrick tells me that he asked Scott _____ and Joe King three years ago to remove a bird feeder and it had "not been done". I had done a similar task for the Forest Service a year before and it was quite the task to perform by myself. In hindsight, this became my first notice of age discrimination.

d.    Summer 2013 – It was not very long before I had more problems. One day, I was trying to load a hot-pressure washer into a shed. The machine was large compared to the size of the shed where it was to be stored. I did not want to throw out my back lifting the machine into the shed by myself. I asked a coworker, Jason Gutierrez, to help me. When I asked him, Jason Guiterrez started to scream "Fuck You!" at me in front of the general public. He

8

was trying to intimidate me.  Nicole Smeeding was there and witnessed the aggression.  I knew someone needed to know about Jason G.'s outburst.  I had a meeting with Union member Anthony Garcia and told him what had happened. He told me Jason Gutierrez should not have done that.  Not really satisfied with that answer, I let John Wells know about the incident.  Later, I found out that Anthony Garcia is Jason Gutierrez's cousin.  My management did nothing and just let Jason Gutierrez' behavior fade away.

       e.      February of 2014 – I had finished my probationary period, however, my management made me feel like I was going to lose my job.  I had successfully completed the Forest Service "Forest Protection Officer" training and could write tickets under 36 C.F.R. § 261.  Nevertheless, the City made me pay for a Learning Disability Evaluation.  I kept my job and later was in charge of training staff to make public contacts.

       f.      Spring of 2014 – Jason Gutierrez and I went to P.O.S.T. together.  We sat right next to each other.  By the end of a particular class, Jason had started pushing and shoving me.  Annoyed, I came back from POST and complained to manager, John Wells, that Jason had gone from verbal abuse to now physical abuse.  John then told me, "I wish you would just put up with it." In other words, Jon Wells did nothing about my complaint.

g.      At this point, I started complaining to Patrick Nelson about Jason G.  Patrick tells me he understands and that Jason and I are "Water and Oil", but did nothing else to address my complaints.

h.      Summer 2014 – Will Springmire is lead of the seasonal crew.  Scott _____, a seasonal employee, brings in a magazine with photographs of nude women and shares nude magazine with Will who openly views the magazine in the view of other seasonal employees.  This makes me feel uncomfortable.  They even give the magazine a "pet" name, according to two other seasonal employees.  I am notified that the seasonal employees do not feel comfortable talking to John Wells about this situation.  They ask me to talk to John about it.  I had to call HR because I was worried being retaliated against.  HR tells me to complain to John.  When I complained to John, he screamed at me, "Who was it?" (meaning, who was it who had complained?).  I said "no".  He screamed louder, "Who was it?"  I said "no".  At this point, he starts throwing papers and he is screaming at the top of his lungs.  I gave into his pressure and told him the name of the coworkers who had complained due to me not feeling like I had a choice.  He continued screaming, "This is bullshit!" (referring to the two seasonal employees who had made the complaint), not the two employees who had actually been looking at the magazine.  From this day

on, John Wells has an obvious problem with me.  Because I was the one to tell John about Will, John retaliates against me in a major way.  John let me know that I "messed" with his friend (Will).  He does not answer my calls, approve time off or discuss policies I had questions about.  I have to go to Patrick due to John being unavailable.  He was not in the office very much and I rarely saw him.  The next season, John tells me that we do not hire "old" seasonal people anymore because of what happened last season, referring to the two seasonal employees (who were in their upper 30s and lower 40s who had complained to me).  Time off slips go unsigned, even with plenty of notice.  John would not answer my phone calls, and not respond to questions regarding operational issues.  I had to go to Patrick for work issues.

       i.     Winter 2014 – I was asked to do a dam inspection at Alta's Cecret Lake.  Benard Mo got permission from John to have me go up there.  Cecret Lake is in an area that is closed off in the winter due to avalanche danger.  Ropes are set up to separate open and closed terrain.  "Ducking under a rope" can land you in a ton of hot water.  I asked Mo if I should check in with ski patrol.  He told me that was not necessary because we own the dam.  When I arrived.  I checked in with ski patrol and found out that ski patrol was doing

avalanche control work above the dam.  Had I not checked in with the ski patrol, I could have possibly been involved in an avalanche.

        j.      June 26, 2015 – During a 16-hour First Responder class, I needed to use the restroom.  While coming out of the restroom (while I facing the front of the room), Jason G. shoves me again.  I complain, but my management does nothing.

        k.      July 3, 2016 – After a long walk up around Lake Mary, Lake Martha and Lake Catheine to Wolverine Cirque down to Twin Lakes on a 4th of July weekend, John asked me and a seasonal employee to walk over to Donut Falls and kick people out of the water.  It was around 2:30 p.m. in the afternoon and the seasonal worker and I had not had a lunch break.  I almost always eat out for lunch and did not have any food.  I was then told, "I had to have a packed lunch and that it had been brought up in meetings that I had to have a packed lunch."  At this point, John is "gaslighting" me.  I called Patrick that day after the conversation with John and told him I was not very happy about the gaslighting.  He told me that having packed lunches was not a policy.  That same weekend, I had a meeting with assistant director Jessie Stewart and John Wells about the risks of walking up to 300 people to try and get them out of the water by Donut Falls was not a good idea.  We came to an agreement that I

would take photos every year on that weekend.  As I am leaving the meeting, I overheard John and Jessie talking about "problems with Patrick".  Patrick moved to the Reagan Building not very long after.

       l.     June 17, 2017 – We were called to mitigate a hazmat spill that happened in Parleys Canyon.  We did not even know what was in the 18-wheeler and we were rushed in to save the water in a manner that was completely against the 8-hour hazwoper training that the department had given us.  Management wanted us to do basically everything the class teaches us not to do.

       m.     November 29, 2017 – I had several conversations with the public and management about having service dogs in training and was not that I could not have a service dog with me on the job, I contacted the Utah Law Disability Center about the issue.  After several days, the Center got back to me and told me Utah State Law allows service dogs in training everywhere service dogs are allowed.  I told Patrick, and he told me that was wrong, and he would need to get with the city attorney.  Later, I asked the same question several times, but never got a satisfactory answer.

       n.     January 2018 – I put in a time off slip for Memorial Day Weekend, five-months in advance.

o.      May 2018 – John Wells lets me know that he has not approved my time off slip.  I have had airfare, hotel and concert tickets since January.  Asking for time off five months in advance only to have it be unapproved at the last minute, had not happened before or since.  This is completely unheard of in the department.  I viewed this as another way to retaliate against me.

p.      2019 – YouTube Video "Protecting Salt Lake City's Watershed".  At 2 minutes 50 seconds, John Wells goes into what it takes to shovel the restrooms.  He says "It took 3 people 4 hours to dig the back access out" and that salt unfroze a huge pile of human waste.  John asked Nicole to dig out that back-access; she said "no".  The next day, John then asks me and Casey to go up and dig it out.  When we got up there, I got working on the back access.  I did not even need his help and told him to just watch.  I dug both out in five minutes.  Nicole said that, afterwards she felt bad, however, she did not apologize.

q.      June 19, 2019 – I am put on short-term disability due to pain in my feet.  I had a doctor's note that had me limit my time on my feet and distances I could walk.  The short-term disability benefit was 2/3 pay for the three months that I was out.  I got stem cell injections in my feet and made a

great comeback.  Unfortunately, my condition was auto-immune and my body attacked the new stem cells.

   r. June 18, 2020 – I applied for long-term disability benefits, but find out Hartford (documented) had denied my application for long-term disability insurance benefits.

   s. March 2021 – Adam Stone is promoted into John Wells' position as Watershed Operations Manager.  Adam is much younger than I am, more than 10 years.  Adam lets Patrick know "(he) thinks that I can do the job, but that I just don't want to".  I tried to explain to Adam that my pace needed to slow down due to my age and disability.  He saw it as I did not want to do the job.  I could do the job.  I could not do the job at management pace.  Our tasks were assigned by operations and tasks were not handed out evenly.  Nicole sprayed way more invasive plants than I did.  I did way more trail work than she did.  Management dealt with this inequality by saying that everyone has their specialty.  This inequity also made relationships in the department toxic.

   t. August 2022 – I overheard Jason G. on the radio talking negative about seasonal employees while they are working an absurd amount of days in a row.  Seasonal morale is at an all-time low.  One seasonal employee quits due to Jason G.'s verbal abuse, and others choose not to go into the fall.

u.      May 22, 2023 – I ask the department for request for accommodation due to my difficultly walking, lifting, carrying, etc.

v.      July 11, 2023 – My management issues a Notice of Intent to Separate from Employment Due to Unavailability, It states: "After speaking with you, your department, and reviewing the essential functions of your position and your restrictions, there is no modification to your current position that could be made to meet your restrictions."  I disagree and request a meeting to discuss accommodation options.

w.      July 5, 2023 – Meeting to discuss light duty options.  I am given the option to take a temporary job for no longer than six months doing water rights.  I had helped two people continue to work to make it to their retirement ages and that option was not given to me.

x.      I had helped Joe King and Scott _____, who had similar mobility issues, past full retirement age.  They were not asked if they could perform the essential functions described in the letter; the department just gave them light work tasks.  Others, including Jason G., were also allowed to work doing less physically demanding tasks.  I was not given any light duty options.

y.    July 2023 – With the City declining to accommodate me, I go on short-term disability again because of pain in my feet and mobility reasons.

z.    July 28, 2023 – Diagnosed with Psoriatic Arthritis

aa.    October 1, 2023, I go back to work.

bb.    October 2023 – Jason G. verbally assaults Abby Jorgenson regarding David Quesenberry's items being stored in the garage.  It's a 20-minute verbal fight.  Due to my past with Jason G., every time I get into a fight with him, it's my fault, so I do not do anything to protect Abby.  I observe.  Thereafter, Abby contacted HR several times with little to no response.

cc.    October 2023 – Jason G. and David Q. also have verbal altercation.

dd.    October 31, 2023 – I asked Aaron Benzon if I could do Storm Water Inspections with another employee so my certification would not expire.  He said that was fine as long as the certification had not expired.

ee.    November 1, 2023, 8:15 a.m. – I called LTAP to see if my storm water certification was expired.  The regular person to talk to was out of the office, so I talked to the assistant.  I asked her if it had expired and told her

that I last did inspections in December 2021 — meaning, I was just under the time limit. She says "yes, it is not expired", so I did the inspections.

ff.     November 6, 2023 – I called LTAP back to see if a Watershed Symposium would work for continuing education credits needed for recertification. She looked up my information and discovered that my certification had expired, and that two years is not from the time of inspections, it's from the class completion. She told me that the inspections that I had done last week did not count. I told her that my supervisor would not be happy with that answer and that I had called last week to make sure it wasn't expired before I did the inspections. She told me she would grant me the grace period needed because of the misunderstanding.

gg.     November 7, 2023 – Aaron Benzon called me at 10:15 a.m. to scream at me, "I told you not to do those inspections if your storm water permit had expired". His rant went on for several minutes. I could not even get a word in. When he finally gave me a moment, I told him what LTAP had told me and how I had relied on what LTAP had told me and that all I needed was the continuing education credits for recertification.

hh.     December 4, 2023 – I have an interview with Salt Lake City Code Enforcement.

18

ii.      December 7, 2023 – I have an interview with Salt Lake City Parley's and City Creek Water Treatment Plant (2 positions).

jj.      December 20, 2023 – During a staff meeting, Patrick Nelson says, "If you don't like it, find another job."  He says, "If you don't like this job, I want you to go find another one".

kk.     December 22, 2023 – On my day off, the Friday before Christmas, I gave Patrick a call after thinking about the meetings we had just had over the past couple of weeks.  At some point in the conversation, Patrick says, "Is this really that bad of a job, it's a good job."  Without hesitation, I say, "I have been physically and mentally abused since I walked in the door."  There was a slight pause and he changed the subject.  No response to what I had just said.

ll.      March 2024 – Will Springmyer becomes Lead Ranger.

mm.   March 17, 2024 – Will Springmyre is now my Lead Supervisor.  His viewing of the pornographic magazine in front of seasonal employees and my complaint to John Wells about the situation several years earlier,  and his close friendship with the former operations supervisor, John Wells, made my job at Watershed significantly harder.

19

nn.     Basically, a few days after Will becomes the lead there is an accident in Parley's Canyon.

oo.     March 24, 2024 – While on patrol, I noticed an accident on the UDOT Traffic app located in upper Parley's Canyon.  I called the treatment plant, and then I called Patrick.  There was no answer, so I called Will on the radio.  Will told me to size up the accident and then call the treatment plant. That was not the proper procedure.  We are supposed to call the treatment plant first, then management, co-workers, then size up the accident.  I tell Will about the accident and that I'm en route and need to call the treatment plant.  I had already called Aaron and Patrick with no answer.  He tells me to check out the accident first and if it's a problem then call the treatment plant.  This is not protocol.  The protocol is to call the treatment plant, then Aaron/Patrick, then go on-site and make an evaluation on-site, then call back with an evaluation depending on the situation.  He wants me to break office protocol.  The retaliation that happened to me after the magazine incident and his now promotion to my supervisor was continuing.

pp.     March 31, 2024 – Will being my new supervisor cause too much additional stress for me to stay working at watershed.  I gave a two weeks' notice.

20

qq.    March 31, 2024 – so knowing I did not have a job to go to, I was not getting a good recommendation from the department, and with the departure of Cressa and Abby, too much of the departments' needs were going to fall on me.  I was back to 100%, but the department wanted me to do much more than was humanly possible (caused by the Department's inability to keep staff due to a toxic work environment).

rr.    I start looking for another job outside of the Salt Lake City Corp.  On May 4, 2023, I have an Interview with Samantha K. Heusser, the State Division of Water Quality Spills Coordinator, she informs me that I was not getting a good reference from the City.

ss.    Last day email sent for April 17, 2024.

tt.    April 17, 2024 – my last day.

uu.    October 1, 2024 – I still cannot find gainful employment due to Salt Lake City Watershed's bad mouthing of me.

### V.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### ADA – DISABILITY DISCRIMINATION — FAILURE TO ACCOMMODATE

31.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 30 above as if alleged in full herein.

32.     Plaintiff alleges that Defendant failed to afford him reasonable accommodations for his disability.

33.     To state a prima facie case of failure to accommodate under the ADA, Plaintiff alleges facts which establish, or tend to establish, that: (1) he was an individual with a disability in that he had an impairment which was substantially limiting to a major life activity, and he was a qualified individual with a disability in that, with reasonable accommodation, he could perform the essential functions of the position he held or desired; (2) Defendant had notice of his disability; (3) he requested plausibly reasonable accommodations, within the meaning of the ADA; (4) Defendant refused, declined or failed to make such accommodations; and (5) the denial of such reasonable accommodations caused Plaintiff some type(s) of harm, loss or other damages.

34.     As alleged above, Plaintiff alleges he was an employee with a disability and a qualified individual with a disability.

35.     Plaintiff alleges that, at various times and in various ways, he made Defendant aware of his disability.

36.     To request ADA accommodations, employees may use "plain English" — *i.e.,* they need not "mention the ADA or use the phrase 'reasonable accommodation'". However, the employee "must let the employer know that he needs

an adjustment or change at work for a reason related to a medical condition". The employee must convey the necessary "link" between his medical condition and the request for accommodation. As alleged above, Plaintiff informed Defendant of is disability and requested various reasonable accommodations which made such link.

37.    Plaintiff alleges that the requests for accommodation he made were simple and straightforward, and that he supplied whatever documentation Defendant suggested or required that he submit.

38.    Requests for accommodations based on the ADAAA are to be acted on within a "reasonable time frame". The ADA give no exact definition, but Section 504 of the Rehabilitation Act does speak to what a reasonable time frame is. "Requests for reasonable accommodations must be processed within a reasonable period of time. What constitutes a reasonable period will depend upon the specific circumstances. However, in general, if supporting medical documentation is not needed, that timeframe should not be longer than five to 10 business days. If supporting medical documentation is needed, or if special equipment must be ordered, that timeframe should not exceed 30 calendar days, unless there are extenuating circumstances beyond the control of the contractor". (C.F.R. § Title 41, Subtitle B, Chapter 60 Part 60-741, Appendix B(8).)

23

39.    Plaintiff alleges that Defendant did not process his requests for reasonable accommodation within a reasonable period of time.

40.    Plaintiff alleges that, when he made requests for accommodation related to his disability, Defendant granted him some accommodation temporarily, but did not afford him the accommodations he needed to be able to keep the job he held or the job he desired on a long-term or consistent basis.  Thus, Plaintiff alleges that Defendant failed to accommodate his disability in a timely or complete manner.

41.    Plaintiff's allegations satisfy all the elements of a claim for failure to reasonably accommodate a disability.

42.    Plaintiff alleges Defendant, through the actions of Defendant's supervisors, violated Title 42, Chapter 126, Subchapter 1, Sections 12112, subsections (a) and (b)(5) of the ADA and ADAAA by failing to make reasonable accommodations to the known limitations of Plaintiff.

43.    Similarly, by failing to provide Plaintiff's requested reasonable accommodations on a long-term or consistent basis, the Defendant has violated Section 11212 of the ADAAA by failing to fulfill the requirement to make reasonable accommodations to the known physical or mental limitations of a qualified individual with a disability, or by failing to prove that the accommodations he did request would impose an undue hardship on the operation of the City.

24

44.    Defendant may allege that to further accommodate Plaintiff's situation would have caused it an undue hardship.

45.    Plaintiff denies any such allegation.

46.    Therefore, the Defendant, having violated Section 11212 of the ADA and ADAAA, is liable to Plaintiff for the damages such failures caused to the fullest extent that pertinent laws allow.

## SECOND CAUSE OF ACTION
## ADA – DISCRIMINATION ON THE BASIS OF DISABILITY

47.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through ___ above as if alleged in full herein.

48.    Plaintiff alleges Defendant discriminated against him on the basis of his disability.

49.    To state a prima facie case of discrimination on the basis of disability under the ADA, Plaintiff alleges facts which establish, or tend to establish, that: (1) he is a person with a disability, within the meaning of the ADA; (2) he is a qualified individual with a disability in that he was able, with reasonable accommodation, to perform the essential functions of the job he held or desired; and (3) Defendant took adverse action against him because of his disability.

50.    Plaintiff alleges he has the impairments of a lifelong learning disability, which substantially limit some of his major life activities, such as learning,

25

speaking/talking, interacting with others and working. Plaintiff also alleges that, during this employment, he developed an impairment with his feet which substantially limited his major life activities of standing, walking and climbing.

51.    Plaintiff alleges he was an employee with a disability. Plaintiff also alleges he was a qualified individual with a disability.

52.    Plaintiff alleges that, in July 2023 and continuing to April 2024, Defendant took adverse action against him when it constructively discharged him from employment.

53.    Plaintiff alleges that several circumstances call for the drawing a reasonable inference that Defendant constructive discharged him because of his disabilities. Plaintiff alleges that his alleged disability had everything to do with the ending of his employment.

54.    Thus, Plaintiff alleges there is a causal connection between his disability and the loss of his employment with Defendant.

55.    Plaintiff's allegations satisfy all the elements of a claim for discrimination on the basis of a disability.

**THIRD CAUSE OF ACTION**
**RETALIATION**

56.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 52 above as if alleged in full herein.

57.     Plaintiff alleges that the Defendant retaliated against him in violation of the ADA.

58.     To state a prima facie case of retaliation, Plaintiff alleges facts which establish, or tend to establish, that: (1) he engaged in protected activity; (2) after Plaintiff did so, Defendant took adverse action against him and that a reasonable employee would have found such action to be materially adverse; and (3) a causal connection exists between the protected activity and the adverse action.

59.     Plaintiff alleges he may satisfy the first element of his prima facie case in several ways.  Plaintiff alleges he satisfied the first element in that, at various times and in various ways, he requested reasonable accommodations related to his alleged disability.  *See Wehrley v. American.  Fam.  Mut Ins.  Co.,*513 F.App'x 733, 740 (10th Cir. 2013) (citing *Jones v. U.P.S., Inc.,* 502 F.34 1176, 1194 (10th Cir. 2007)).


60.     Plaintiff alleges that, when he made such requests for reasonable accommodation, he engaged in protected activity.

61.     Plaintiff's allegations satisfy the first element of his prima facie case.

62.     Plaintiff alleges that, after he engaged in protected activity, Defendant subjected him to adverse employment actions.  The Supreme Court has set

forth the standard to be used in determining what constitutes an adverse employment

action. Specifically, the action must be materially adverse to a reasonable employee or

applicant. The Supreme Court explained that "materially adverse" means that the harm

must be significant. It also explained that the determination must be made objectively,

and thus must be measured against how a "reasonable person" would feel or act, an

employee must show that the action "well might have dissuaded a reasonable worker

from making or supporting a charge of discrimination". However, the Supreme Court

emphasized that whether any given act constituted retaliation may depend upon the

particular circumstances. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68

(2006).

63.    Plaintiff alleges that Defendant took adverse actions against him

in several ways, including when it constructively discharged him from his employment.

64.    Plaintiff's allegations satisfy the second element of his prima facie

case.

65.    Plaintiff alleges a causal connection existed between his

engagement in protected activity and the adverse actions. A "causal connection may be

demonstrated by evidence of circumstances that justify an inference of retaliatory

motive, such as protected conduct closely followed by an adverse action". *O'Neal v.*

*Ferguson Constr. Co.,* 237 F.3d 1248, 1258 (10th Cir. 2001) (quoting *Burrus v. United*

*Tel. Co. of Kansas Inc.,* 683 F.2d 339, 343 (10th Cir. 1982)).

66.    Plaintiff alleges that, soon after he began making his requests for

reasonable accommodation, Defendant began taking adverse actions against him.

67.    Plaintiff alleges that, after he began requesting accommodations,

his boss rarely, if ever, communicated with him.

68.    Plaintiff alleges that the more he tried to request accommodations,

the more his management harassed and finally forced him to quit.

69.    In the instant case, just a short period of time separated Plaintiff's

latest requests for an accommodation and his constructive discharge.  Plaintiff alleges

the temporal proximity between his protected activity and his termination supports an

inference of a causal connection.

70.    This supports the inference that Defendant constructively

discharged Plaintiff because of his requests for accommodation.

71.    Plaintiff's allegations satisfy the third element of his prima facie

case.

72.    Plaintiff's allegations state a prima facie claim of unlawful

retaliation.

73.     Plaintiff alleges that any reasons the Defendants may give for the constructive discharge are and will be false and pretextual.

74.     Given the temporal proximity and lack of documented performance issues, Plaintiff alleges he was constructively terminated in retaliation for requesting reasonable accommodations.

## VI.  DAMAGES

75.     Mr. Gunn alleges Defendant's actions and inactions have caused him various losses, injuries and other damages, including lost wages, lost benefits, financial stress and emotional distress.

## VII.  RELIEF REQUESTED

Accordingly, based on the above allegations, claims and damages, Plaintiff requests the following relief, specifically an Order and Judgment:

1.    Declaring that Defendant discriminated against Mr. Gunn on the basis of his age, disability, and engagement in protected activity, in violation of the Title VII, the ADEA, and the ADA;

2.    Awarding Mr. Gunn "make whole" relief;

3.    Awarding Mr. Gunn lost wages and benefits from the time Defendant terminated Mr. Gunn's employment until Mr. Gunn

secures comparable employment, or for a period of five years,

whichever occurs first;

4.    Awarding Mr. Gunn his reasonable attorney's fees and costs;

5.    Awarding Mr. Gunn such other relief as may be just and equitable.

DATED this 23rd day of September, 2025.


                */s/ David J. Holdsworth*
              David J. Holdsworth
              *Attorney for Plaintiff*

## VERIFICATION

Michael Gunn, being first duly sworn, upon his oath, deposes and says that he is the Plaintiff in the above-entitled action, that he helped prepare and has read the foregoing COMPLAINT and understands the contents thereof, and the statements made therein are true to the best of his knowledge and recollection.


_/s/ Michael Gunn_____
Michael Gunn


SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 20___.


_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:        RESIDING AT: _____

_____